**BEARD DRILLING, INC., Appellant,**

v.

**W. J. STEEGER et al., Appellees.**

No. 13980.

Court of Civil Appeals of Texas.

Houston.

Nov. 1, 1962.

Rehearing Denied Nov. 29, 1962.

Spafford, Ledbetter, Freedman, Hamlin & Gay, Donald G. Gay and Roy C. Letbetter, Dallas, of counsel, for appellant.

Finis E. Cowan, Houston, Baker, Botts, Shepherd & Coates, Houston, of counsel, for appellees.

COLEMAN, Justice.

This suit was filed by appellant, Beard Drilling, Inc., to recover the value of oil well drilling equipment from appellees, W. J. Steeger, M. M. Kinley, Atlas Pipe, Inc., and C. L. McMahon, Inc. Appellees filed a cross-action seeking to recover from appellant the expense incurred by them in controlling a gas well which blew out and caught fire, destroying appellant's drilling equipment. The trial court rendered judgment for appellees based on appellant's failure to drill the well to completion as required by the written contract between the parties.

Both parties pled causes of action based on certain provisions of the contract and on allegations of negligence. Appellees filed a motion for summary judgment which was sustained as to that portion of appellant's cause of action based on contract. The cause proceeded to trial before a jury on the negligence issues. The jury found that neither appellant nor appellees were guilty of acts of negligence proximately causing damage to the other party.

Appellant has grouped its points of error. The first group complains that the District Court of Harris County erred in entering the interlocutory summary judgment, in refusing to allow a trial amendment based on the contract, and in refusing to admit certain testimony.

The contract between the parties reads as follows:

ROTARY DRILLING CONTRACT

"THIS AGREEMENT between W. J. Steeger whose address is 1702 Esperson Bldg. Houston, Texas, herein called owner, and Beard Drlg, Inc. whose address is 1401 Majestic Bldg. San Antonio, Texas herein called contractor, (all referred to by singular masculine pronouns whether corpora-

tions, firms or individuals) WITNESSETH:

"1. OBLIGATIONS. Contractor agrees to drill, core, test, survey, and finally complete and equip, or plug and abandon, a test well for oil and gas at the time and place, to the depth, and in the manner provided herein and in the specifications below, and owner agrees to pay contractor therefor the price set out in said specifications.

"2. EQUIPMENT AND LABOR.

"a. FURNISHED BY OWNER: Owner, at his expense, shall furnish the services and materials required of him in said specifications and in addition thereto, all casing (both surface and production), tubing, wellhead connections, separators, flow lines, and other completion equipment installed in or upon said well and location, and all required services and equipment of third persons for drill stem tests, side wall cores, casing perforations, electrical logs, cementing (including surface and production casing and squeeze jobs), and all cement so required.

"b. FURNISHED BY CONTRACTOR: Contractor, at his expense, shall furnish what is required of him in said specifications, and also an adequate rotary drilling rig, including blowout preventer, and all other machinery, tools, equipment, materials, services, and labor necessary or proper to the performance of said work, except those to be supplied by owner as set forth above or in said specifications.

"3. PERFORMANCE. All such work shall be performed by contractor diligently, in a good and workmanlike manner, and in compliance with all applicable governmental rules and regulations. Contractor shall be entitled to no compensation for any partial performance hereof, or upon any basis other than full and complete performance.

"4. OWNER'S PREROGATIVES, ACCESS, AND NOTICE. The size and amount of casing (both surface and production) to be set, and the time, place, manner, and extent of all cementing, coring, testing, electric logging, perforating, squeezing, and completing said well shall be determined by owner and conducted accordingly. Owner and his nominees shall have access to the derrick floor and premises at all times, shall be furnished complete samples and full information at the times and places directed by him, and shall be notified and afforded reasonable opportunity to be present and to observe all coring and testing.

"5. RISK AND INSURANCE. Except as otherwise provided in said specifications, all work hereunder shall be conducted at contractor's sole risk, and shall be covered by public liability and workman's compensation insurance, to be carried and paid for by contractor, in amounts and with companies acceptable to and approved by owner.

"6. OWNER'S OPTIONS ON CONTRACTOR'S DEFAULT. If contractor shall fail or be unable to complete this contract (which shall be established by any cessation of work for as much as five days unless ordered by owner), owner, in addition to all other rights and remedies hereunder, may at his option, either take over and use contractor's drilling rig and other equipment, free of cost, and continue the unfinished work, or remove such drilling rig and equipment, and employ another contractor to continue the work. In either such event all costs and expenses so incurred by owner shall be deducted from any payment to contractor.

"8. CONSTRUCTION AND VENUE. Contractor acts hereunder as, and shall be held to be, an independent contractor, and not owner's agent or employee. Time is of the essence hereof. Venue hereunder is fixed by agreement in the county of owner's above address.

" copies hereof are signed this 2 day of February 1959.

/s/ W. J. Steeger
————————————————
 OWNER
/s/ Joe Beard
————————————————
President CONTRACTOR"

## SPECIFICATIONS

"A. TIME, DEPTH, HOLE, AND LOCATION:

1. Location: 2 wells in Torch Field, Zavalla County &
 1 well W. C. (Standifer) Dimmitt County

2. Commence actual drilling (spud in) by

3. Drill to maximum depth of feet below surface, or
 3612' – Torch Field – 2 wells – 7224' – (not consecutive)
 4500' – Standifer – 1 well – 4500'
 11,724' total
 & 7 7/8" as disered

4. The hold shall be 8 3/4" inches in diameter, and shall be
 straight, with no variation of more than 3 degrees from vertical,
 to determine which contractor shall run straight hole surveys at
 intervals of not more than 500 feet.

5. Complete all operations by

B. SERVICES TO BE FURNISHED AND PAID FOR BY OWNER
 OR CONTRACTOR AS FOLLOWS:

1. Survey and stake
 location: owner
 ~~contractor~~

2. Clear location: owner
 ~~contractor~~

3. Build and maintain
 necessary roads: owner
 ~~contractor~~

4. Dig cellar and pits: ~~owner~~
 contractor

5. Erect derrick: ~~owner~~
 contractor

6. Move rig to location: ~~owner~~
 contractor

7. Fill pits on com-
 pletion: owner
 ~~contractor~~

C. EQUIPMENT AND MATERIALS TO BE FURNISHED AND
 PAID FOR BY OWNER OR CONTRACTOR AS FOL-
 LOWS:

1. Derrick: ~~owner~~
 contractor

2. Fuel: ~~owner~~
 contractor

3. Water: ~~owner~~
 contractor

4. Shale ? : ~~owner~~
 contractor

5. Conventional core
 barrels: owner
 ~~contractor~~

6. Conventional core
 heads and catch-
 ers: owner
 ~~contractor~~

7. Wire line coring
 equipment: ~~owner~~
 contractor

8. Wire line heads
 and catchers: owner
 ~~contractor~~

9. Mud Weighting
 materials: owner
 ~~contractor~~

10. Fishing tools ~~owner~~
 ~~contractor~~

Except, Owner when on day rate

D. CONTRACT PRICE:
1. FOOTAGE: For the depth actually drilled, exclusive of all footage-cored, contractor shall be paid $ 2.60 per lineal foot.
2. DAY TIME:
 a. Rates: The day rates to be paid contractor by owner, when applicable, in addition to the footage payment above provided, shall be:

 No. 1. While drill stem in use $xxxxx per hour: 22.90

 No. 2. While drill stem not in use: $ – per hour. 20.00

 No. 3. While idle, waiting on orders: $ 18.00 per hour, provided that Rate No. 3 shall not apply for more than 24 hours.

 b. Payable When: The above day rates shall be paid for all time consumed in:
 (1) Coring: #1
 (2) Reaming core hole: #1
 (3) Drill stem tests: #1
 (4) Electric logging: #2
 (5) Perforating casing: #2
 (6) Squeezing: #1
 (7) Swabbing or otherwise completing the well after cement has set: #2
 (8) Plugging the well on abandonment: #1
 (9) Pulling and racking casing on owner's instructions: #2
 (10) Other delays or interruptions ordered by owner, provided that no charge shall be made for the time required to run and cement casing (both surface and production), run tubing, set and cement screen or liner, install valves, wellhead connections, or flow lines, nor for the time necessary for cement to set, not to exceed 24 hours on surface casing, 0 hours after each squeeze job, and 48 hours on production casing. & completion after plug is down in oil string

E. RISK: The operations enumerated in subdivisions (1) to (9) inclusive of paragraph 'D-2-b' immediately above, shall be conducted at owners risk and expense, provided however, that owner shall never be liable for contractor's negligence or want of skill or diligence, or for failure of contractor's equipment.

48 hours free time allowed before oil string is run

Gulf Coast Clause shall apply

When the second well in the Torch Field is drilled this contract shall apply except the footage price shall be $2.40 per "

The foregoing specifications are approved:

/s/ _____ W. J. Steeger _____
 for OWNER
/s/ _ Joe Beard _____
 for CONTRACTOR"

Appellant began operations under this contract. Appellees wrote appellant a letter dated March 13, 1959, containing the following paragraph:

"3. 2524 feet, run correlation log, if in 1st Olmos Sand, run open hold D S T, if water free test run, start coring. Measure out of hole last trip before 2524 is reached as it is important that you stop at 2524."

On May 17, 1959, Mr. Lewis arrived at the well when the depth reached was about 2500 feet. He together with the president of appellant Corporation, Joe Beard, left the site to call the electric logging truck. Before leaving they informed the driller that when he got to 2524 feet he was to circulate the mud and come out of the hole in order to be in a position to run the electric log. The driller followed these instructions by continuing to drill until the required depth was reached. The mud was then circulated for 45 minutes and the process of "pulling out of the hole" was started when Mr. Lewis and Mr. Beard returned. Just as they were getting out of the car, the well blew out and caught on fire. Most of appellant's drilling equipment at the well site was destroyed. Appellees assumed control of the well and expended a large sum of money in putting out the fire and stopping the flow of gas.

The trial court, in granting appellees' motion for summary judgment, ordered:

"And the Court having duly considered the motion and having heard argument in support of and in opposition thereto, and having considered all of the depositions on file herein and the affidavits on file herein, finds and concludes as a matter of law that in this particular contract the term 'electric logging' does not include the process of withdrawing drill-pipe from the hole before electric logging, and that as a matter of law based on the pleadings, the undisputed evidence from the depositions and the affidavits, that the Plaintiff is not entitled to recover from the Defendants without a showing of negligence on the part of the Defendants, and that the paragraph 'E' does not afford the Plaintiff a right to indemnity from the Defendants or a right of recovery from the Defendants without a showing of Defendants' negligence. It is

"ORDERED, ADJUDGED AND DECREED that the Defendants' Motion for Summary Judgment is granted in so far as it pertains to the Plaintiff's contractural theory of recovery, and paragraph '5' of the Plaintiff's FIRST AMENDED ORIGINAL PETITION is ordered stricken."

The first question to be determined is whether or not the trial court properly interpreted the contract in determining that paragraph D–2–E did not impose on appellees the risk of damage to appellant's drilling rig when it was being used to pull drilling pipe from the well in order that the employees of the Schlumberger Company would be able to lower electric logging equipment into the well.

In Brown v. Payne, 142 Tex. 102, 176 S. W.2d 306, the court said:

"The rule is well stated in Turner et al. v. Montgomery et al., Tex.Com.App., 293 S.W. 815, as to the construction of instruments, as follows: 'Through all the rules governing construction of instruments, there runs the central thought of ascertaining the real intention of the parties. In the nature of such inquiry, there can be no fixed rule, for every case, in large measure, depends upon its own facts, context of instrument, and circumstances. Of course it is elementary, if there is no ambiguity, the construction of the written instrument is for the court, and moreover, even in those cases of ambiguous instruments, if the parol evidence is undisputed as to the circumstances, the construction is yet a question of law for the court.' "

The parties agree that the contract provides that during "electric logging" the

"risk and expense" is on the owner, but they disagree as to the meaning that should be given to the quoted words. It seems clear that the paragraph D–2–E says that the operation of electric logging shall be conducted at owner's risk and expense. In paragraph 1. the contractor agrees to *drill, core, test, survey* and complete or abandon a test well for oil and gas. In paragraph 2.a. the owner agrees to furnish all required services and equipment of third persons for drill stem *tests,* side wall *cores,* and *electrical logs.* By paragraph 2.b. the contractor agrees to furnish the drilling rig and all other machinery, equipment, tools materials and labor necessary or proper to the performance of the work, except those which owner specifically agrees to furnish. Paragraph 3. provides that the contractor should receive no compensation unless he performs the contract fully and completely and that contractor should receive no compensation for partial performance. This contract was prepared by filling in blanks on a form copyrighted in 1955 and evidently is widely used in Texas. These provisions must be construed together. A consideration of the provisions of the contract referred to above demonstrates that the parties contemplated that in surveying the well by the process of electrical logging, as well as in running tests and coring, the contractor would have certain duties in addition to those performed by the equipment and labor of third persons.

The testimony of Joe Beard was before the court at the time he ruled on the motion for summary judgment. He testified that the term "electric logging" had a well accepted meaning throughout the oil industry, and that generally speaking the term was used to describe that procedure "whereby a company like Schlumberger comes out to a well, lowers certain instruments into a well, shoots electric currents through there for the purpose of conducting certain tests." He further testified as follows:

"Q. * * * Is it not true that since neither you nor your employees have the technical know how nor the techni-

cal equipment to conduct electric logging that the operation of electric logging does not commence until the people who have that equipment and that technical know how arrive and start doing the work?

"A. Your question involves my opinion as to when the electric logging operation commences?

"Q. Specifically logging, Yes.

"A. Logging commences when their equipment is rigged up on the location."

In his affidavit controverting the motion for summary judgment Beard stated: "* * * at the time of the blow out * * * the operation of electric logging had begun * * *. The electric logging operation consists in part of circulating the mud in the well." Appellee contends that these statements are legal conclusions which would not have been admissible at a trial. While the statement that the "electric logging operation consists in part of circulating the mud" appears to be a statement of fact, we quote it merely to illustrate appellant's contention that there is a difference between "electric logging" and the *operation* of making an electrical log.

The evidence also reflected that under an identical contract between the same parties for the drilling of a previous well, appellant submitted a statement for "day rate" work at $22.50 per hour. "12–29–58 run correlation log 3:00 a. m. to 10: a. m." The daily drilling reports furnished appellee broke down the seven hour period into the time spent circulating mud, pulling drill pipe, and running survey. This is evidence that the parties considered the work of preparing the hole for testing as a part of the operation of making an electric or correlation log. The previous interpretation placed on a contract by the parties may be considered by the Court in interpreting the contract. Archer v. Skelly Oil Company, Tex.Civ. App., 314 S.W.2d 655, ref., n. r. e. 159 Tex. 154, 317 S.W.2d 47.

By virtue of paragraph 4. of the contract the owner could determine the time, place,

manner, and extent of certain named operations including electric logging. There is no express provision in the contract authorizing the owner to direct the contractor to circulate mud and pull the drill pipe except such authority as may be implied from this provision. If the parties intended that the owner be authorized to direct the circulation of mud and the pulling of the drill pipe as an incident to his authority to direct the manner of making an electric log, it seems logical that they regarded such work as part of the *operation* of making an electric log. We think that by use of the words "time, place, manner, and extent" in paragraph 4. of the contract, the parties intended that the contractor be obligated to perform, *under the direction and control of the owner,* such work as might be necessary in preparation for the operations listed. The actual work involved in cementing, coring, perforating, electric logging and other specialized jobs would be performed by the employees of specialty contractors furnished by the owner under paragraph 2.a. of the contract.

Under such circumstances it is not inconsistent that the risk and expense of conducting the operations should be placed on appellee as provided in paragraph E. of the specifications. It should be noted that in such paragraph it is also provided that the owner should never be liable for contractor's negligence or want of skill or diligence, or for failure of contractor's equipment. The inclusion of these specific exceptions to the possible liability of the owner indicates that the owner assumed responsibility for such other hazards, arising by reason of the operation being conducted, as personal injury and property damage caused by a blow

out and fire and expenses incurred in bringing the well under control.

In paragraph C. of the contract specifications it is agreed that the contractor shall pay for fishing tools except when operating on day rate. This provision is consistent with an intention on part of the parties to place the risk of loss on the owner when he is in control of the operations.

It will be noted that paragraph 4. also provides that the "time, place, manner, and extent" of "completing" the well shall be determined by the owner and "conducted accordingly." It can hardly be doubted that this work would be done by the contractor at day rates and "at owner's risk and expense." A dispute might arise as to what work is involved in the *operation* of completing a well. In this case there is no dispute as to the meaning of the words "electric logging," the dispute is as to the work included in the operation of electric logging. The fact that "logging" commences when the specialized equipment is rigged up on the location is not inconsistent with a decision that the operation of electric logging begins with the work of circulating mud in preparation for "logging." There was no direct testimony as to the meaning of the term "operation of electric logging" before the court at the summary judgment hearing other than the testimony of Joe Beard, which appellee attacks as being a conclusion entitled to no weight. Since the facts were not in dispute, the meaning to be given these words must be determined by the court. Brown v. Payne, supra.

The fact that under the Gulf Coast Clause [1] appellee's liability to appellant for

---

1. "In the event of loss of circulation, partial loss of circulation, water flow, domal formation, abnormal pressures, heaving shale, or similar formation, salt or other similar condition, is encountered which makes drilling abnormally difficult or hazardous, causes sticking of drill pipe or casing, or other similar difficulty which precludes drilling ahead under reasonably normal procedures, Contractor shall, in all such cases, without undue delay, exert every reasonable effort to overcome such difficulty. When such condition is encountered, Owner shall assume risk of loss or damage to the hole and to Contractor's equipment in the hole. Should such condition or conditions persist in spite of Contractor's efforts to overcome them, then after a period of twenty-four (24) hours time consumed in such efforts, further operations shall be conducted on a day work basis at the

damage to his drilling equipment would have been limited to loss of such part of the equipment as was in the hole does not affect our construction of this contract. This clause applies whether or not the owner has the right to control the operation being conducted at the time of the blow out. It is not a general limitation of appellant's right to damage, but rather grants the contractor a right to limited compensation where, in the absence of such a clause, he would be entitled to nothing.

The use in paragraph E. of the contract specifications of the words "owner's risk and expense" qualified as to cause of loss or expense, but without qualification as to the extent of liability, in contrast to the wording of the Gulf Coast Clause, incorporated into the contract, which restricts the owner's risk to loss of or damage to the hole and contractor's equipment in the hole, indicates that the failure to define the extent of liability of the owner in said paragraph was not caused by inadvertence, but was deliberate.

■ The trial court has rendered judgment for appellees on the theory that the expense of bringing the well under control and extinguishing the fire should be borne by the drilling contractor either because he was obligated under the contract to complete the well or because of the provision of the contract (Paragraph 5.) that all work under the contract should be conducted at contractor's sole risk, unless assumed by owner in the specifications. Under either theory the work of circulating the mud and pulling the drill stem would be conducted at contractor's risk although, as we have held, these operations were subject to the owner's direction and control. We think it unlikely that this result was intended by the contracting parties.

Considering the language of the contract and specifications, and the surrounding circumstances concerning which there is no material dispute of fact, we conclude that the parties intended that the process of circulating mud and removing the drill stem, when ordered by the owner in preparation for making an electric log, should constitute part of the operation of electric logging. Petersen v. Robinson Oil & Gas Company, Tex.Civ.App., 356 S.W.2d 217. We further conclude that the parties intended the words "at owner's risk and expense," as used in paragraph E. of the specifications, to mean that the owner should be liable for damage to contractor's drilling equipment and for the expense of controlling the well under the facts shown by the record in this case.

■■ Appellant's ninth Point of Error complains of the action of the court in excluding certain testimony. The witness Whitaker was not permitted to answer the following question: "Did you or did you not observe anything as to what might have caused the gas to come out?" The objection was made that the question called for a geological, engineering opinion and invaded the province of the jury. A witness may qualify as an expert by reason of special knowledge acquired through experience or study. McCormick and Ray, Texas Law of Evidence, Vol. 2, p. 233. Whether or not a witness is so qualified is a matter to be determined by the court and his determination will not be disturbed in absence of abuse of discretion. The facts in this case do not establish abuse of discretion. Appellant did not perfect a bill of exception showing the answer which would have been made to the question and we may not speculate on what such answer might have been. In the absence of a bill of exceptions, this Court cannot determine whether or not an error in

applicable day work rate until such conditions have been overcome and normal drilling operations can be resumed. The total time furnished by Contractor under the terms of this paragraph shall be limited to twenty-four (24) hours. The footage drilled while on day work basis shall be deducted from the footage charge. 'Abnormal pressures' shall be considered to exist in the event a mud weight in excess of 12 pounds per gallon (unless otherwise specified in Par. 2 of Exhibit "A") is required."

sustaining an objection to a question resulted in harm or probably caused the rendition of an improper judgment.

 Appellant requested the submission of certain special issues inquiring whether Lewis learned on March 17, 1959, that the formations were being encountered at a lesser depth than expected and whether, thereafter, Lewis ordered appellant to continue drilling to 2524 feet, and whether the giving of such order was negligence and a proximate cause of damage. These issues were refused by the court, and this refusal is made a point of error. These issues were based on pleadings which were offered as a trial amendment. The trial court's refusal to grant permission to file the trial amendment is made a point of error. While trial amendments should be freely allowed, the action of the trial court in refusing to allow such an amendment to be filed is an exercise of judicial discretion and will be sustained on appeal unless the complaining party can show abuse of discretion. Emmons v. Travelers Ins. Co., Tex.Civ.App., 349 S.W. 2d 282; Shaw v. Tyler Bank and Trust Co., Tex.Civ.App., 285 S.W.2d 782, error ref., n. r. e.

In this instance the trial court did not abuse its discretion since the refusal of the trial amendment did not result in harm to appellant. The answers to the issues requested by appellant in submitting the defensive matter alleged in the trial amendment could not have affected the judgment to be entered in the cause. As a matter of law the instruction to drill into the gas producing formation under the facts of this case could not have been negligence. Issues might arise as to whether the drilling should have continued without further safety precautions, but the order to drill could not be a basis for a finding of negligence in the absence of a duty on the part of the owner to take safety measures. Appellant was bound by its contract to drill. Appellee had the right to stop the drilling for the purpose of making tests, but there was no duty on appellee to supervise the manner in which appellant conducted the drilling operations prior to the time he assumed control for the purpose of testing.

All other Points presented by appellant's brief have been carefully considered, but they concern matters which will not likely recur at another trial and it is not necessary to extend this opinion by discussing them.

 It follows that the trial court erred in granting the summary judgment and in entering judgment for appellee on the verdict of the jury. Since by their verdict the jury found neither party guilty of negligence, the court should have rendered a judgment in favor of appellant on appellees' cross-action. The court, however, could not properly render judgment in favor of appellant on its cause of action based on the contract since the petition on which it went to trial had been amended, by order of the court, so as to eliminate its contention that appellee was liable for the destruction of its drilling equipment by virtue of paragraph E. of the contract specifications. This order of the court was contained in the summary judgment and the court's error in requiring the amendment to appellant's petition was presented to this Court by the Point of Error complaining of the summary judgment. While the court erred in requiring the amendment, the petition was amended and this Court would not be able to render a judgment for appellant on its cause of action based on the contract since such a judgment would not be supported by the pleadings.

The trial court erred in refusing to permit appellant to file a trial amendment based on paragraph E. of the specifications to the contract. The summary judgment was interlocutory. City of San Antonio v. Castillo, Tex.Civ.App., 285 S.W.2d 835; Bryant v. City of Austin, Tex.Civ.App., 290 S.W.2d 567, error ref., n. r. e.; Minchen v. Murrah, Tex.Civ.App., 285 S.W.2d 372, error ref. Such a judgment or order can be changed, modified, or set aside at any time before the judgment on the merits becomes final. Pan American Petroleum Corp. v. Texas Pac.

Coal & Oil Co., Tex.Civ.App., 340 S.W.2d 548, error ref., n. r. e.; Sneed v. Martin, Tex.Civ.App., 292 S.W.2d 891. Since the action of the court in entering the summary judgment was erronous, the refusal to permit appellant to file its trial amendment, submitted before testimony was begun, on the ground that the matter had been settled by the summary judgment, was also error. Whitaker v. Wilson, Tex.Civ.App., 349 S.W. 2d 753, error ref., n. r. e.

Since the case was tried on an erroneous interpretation of the contract and considering the provision of the contract absolving the owner of liability while tests were being conducted if the loss or damage results from either the negligence or want of skill or diligence of the contractor, or by reason of the failure of the contractor's equipment, justice will be served by reversing and remanding the entire case for a new trial, rather than the cause of action on the contract alone.

The judgment of the Trial Court is reversed and the cause is remanded for a new trial.