**Doll SHAW, Appellant,**

v.

**TYLER BANK & TRUST COMPANY et al., Appellees.**

**No. 6851.**

Court of Civil Appeals of Texas.

Texarkana.

Dec. 15, 1955.

Rehearing Denied Jan. 12, 1956.

Fulton, Hancock & McClain, Florence, & Florence, C. E. Florence, F. L. Garrison, Glimer, for appellant.

William S. Reeves, Lawrence & Lawrence, Tyler, for appellees.

DAVIS, Justice.

Plaintiff-appellant, Doll Shaw, a widow, sued the defendants-appellees, Tyler State Bank & Trust Company, now Tyler Bank & Trust Company, hereinafter referred to as the Bank, and J. Harold Stringer, its executive vice-president, to recover $19,000 in money and property allegedly advanced by appellant to appellees on September 7, 1951, as the result of fraudulent representation made to appellant by appellee Stringer, individually and as executive vice-

president of the Bank, which fraudulent representation appellant believed and relied upon and in so doing parted with her money and property.

Trial was to a jury and at the conclusion of plaintiff's testimony, appellees moved for an instructed verdict which was granted by the trial court. In determining whether or not a verdict should have been directed, we shall have to disregard all conflicts and contradictions that may appear in the evidence and consider the evidence in the light most favorable to the party against whom the verdict was directed. Every intendment fairly deducible from the evidence will be made in favor of the losing party. *A reviewing court must disregard testimony favorable to the party for whom the verdict was directed and consider only the evidence favorable to the losing party.* And then it must be of such character in favor of the winning party that there is no room for ordinary minds to differ as to the conclusions to be drawn from it if the judgment is to be upheld. This has been the established rule so long that citation of authorities seems unnecessary. Numerous authorities will be found collated under Note 8, "Determination of evidentiary grounds" under Rule 268, Vernon's Ann.Tex.Rules of Civil Procedure; 3–B Tex.Jur. 362, Sec. 908, and authorities cited therein.

We are confronted with the fact that separate motions for instructed verdict were filed by the Bank and Stringer which were identical except that the Bank added a sixth assignment wherein it contended that there was no evidence to show that the Bank was liable to appellant, and that there was no evidence that the actions complained of were made by any agent or representative of the Bank during the course of his employment and that any promise as alleged or proven by appellant was ultra vires and without the scope of employment of any agent of the Bank. The trial court granted the motion without specifically stating in his order granting the motion or in his judgment which of the grounds he relied upon in granting same. "The rea-son for the requirement of Rule 268, Texas Rules of Civil Procedure, that a motion for directed verdict 'shall state the specific grounds therefor' is defeated where, as here, more than one ground is stated but the order on the motion or the judgment fails to state which ground is sustained. * * *" Harris v. Sanderson, Tex.Civ.App., 178 S.W.2d 315, 316, writ ref., w. o. m.

The first five grounds in the motion for instructed verdict by the appellees are as follows:

"I.

"The Plaintiff has wholly failed to pove the cause of action in this cause by her alleged.

"II.

"Because the Plaintiff has wholly failed to prove any cause of action against the Defendant, or either of the Defendants.

"III.

"The uncontroverted evidence shows that the Plaintiff relies on alleged misrepresentations as to performance of a promise of a future action which is not actionable in law.

"IV.

"Because the Plaintiff has not alleged or proved any breach of any promise by Defendants, or either of them.

"V.

"Because Plaintiff has not alleged or proved any damage accruing to her by the actions, promises or conduct of this defendant."

We have no way of knowing which of the grounds the trial court relied upon; therefore, in order to dispose of this appeal, we have had to review the entire record upon each ground separately. We are unable to find any authority that requires the trial court to state a specific ground upon which an instructed verdict is granted when more than one ground is stated in the motion. In our opinion, a better prac-

tice would be to state the specific ground or grounds upon which the motion is granted either in the order granting the motion or in the judgment. From the briefs and arguments in this case, it seems that the trial court relied upon assignment No. 3 in the motions for instructed verdict.

In view of the state of the record, it will be necessary to make a lengthy statement of the pleadings and the evidence and will unduly lengthen this opinion.

### Statement of the Case.

Mrs. Shaw alleged that on September 7, 1951, appellee Stringer as executive vice-president of the Bank, called at her home and informed her that he had on various days and dates honored drafts drawn upon the Bank by Shaw Packing Company, a corporation (hereinafter referred to as the Company), by her son, J. H. (Jimmy) Shaw, who was president of the Company, and J. M. Walker who was working for the Company (and who was executive vice-president and general manager of the Company) until said Company was overdrawn in the sum of $20,000; that Stringer told her it was necessary that the overdrafts be taken care of by two o'clock on that date as the bank examiners were in town and would be at their Bank for the purpose of examining same by two o'clock on that date or not later than seven o'clock the following morning; that Stringer told her that if the examiners should find that he, Stringer, had permitted the Company to overdraw to the extent of $20,000 it would mean his, Stringer's job, and might mean the penitentiary. She further alleged that Stringer was crying and begging her to cover the Company's overdrafts until the examiners had finished at the bank and had left town; that she informed Stringer that she had only about $19,000; $9,000 in cash and $10,000 in building and loan stock, and could not cover drafts amounting to $20,000 because the $19,000 was every penny she had; that appellee Stringer then told her that he could arrange for the other $1,000; that when Stringer came to her house he had the check for $9,000 prepared for her signature (her $9,000 being on deposit in

appellee Bank), and had a note prepared for $10,000 payable to the Bank in the principal sum of $10,000 to be secured by the building and loan stock (in which Loan Association the evidence shows the Tyler State Bank & Trust Company was financially interested). She further alleged that she finally agreed to let the Bank and/or Stringer have the money she had on deposit in said Bank and make the note secured by her stock in said Loan Association. (Stringer brought with him also a note and an assignment on the Loan Association stock already prepared to be signed by Mrs. Shaw to secure the payment of the note; and the note was executed by Mrs. Shaw payable to the Bank 30 days after date.) She alleged that she agreed to let the Bank and/or Stringer have the money with the express understanding that it would be repaid to her as soon as the bank examiners left town, and to be within not less than seven or more than ten days. She specifically alleged that Stringer in his negotiations with appellant when he obtained from her the $19,000 that he was acting as the agent and as executive vice-president of the Bank. She further alleged that there were no bank examiners in town at that time and that none came for several months thereafter. (The evidence shows that none came for about four or four-and-a-half months.) Mrs. Shaw also alleged that Stringer promised her that he would personally see that the money was repaid to her as soon as the bank examiners left town, and that she believed and relied upon such representation made by Stringer individually and as executive vice-president of the Bank; and in believing and relying upon the promises made to her by Stringer acting for himself and the Bank, she gave to Stringer the $9,000 in cash by check and gave him her note for $10,000 secured by $10,000 worth of shares of capital stock of the building and loan association. She alleged that she would not have parted with her money or executed her note if she had not been led to believe the money and note would be returned to her immediately after the bank examiners left said Bank. She alleged that Stringer and the Bank

though demanded to do so, had failed and refused, and still fail and refuse, to repay the plaintiff her $9,000 or to return her note in the sum of $10,000 to her damage in the total sum of $19,000, and though repeated demands have been made upon appellees for the return of the money and property, appellees have failed and refused, and still fail and refuse to do so.

She alleged that the representations of Stringer, individually and as vice-president of the Bank, were fraudulently made for the purpose of inducing her to give to said Bank her check for $9,000 and to execute the note for $10,000 and pledge her stock as security therefor.

Mrs. Shaw is the widow of J. D. Shaw who died December 3, 1950. At the time of his death, he, Mrs. Shaw and J. H. (Jimmy) Shaw owned all the stock in the Shaw Packing Company, a corporation, and constituted the Board of Directors.

Immediately after the death of Mr. Shaw, the Bank had its attorney prepare the necessary minutes to have Mrs. Shaw removed as a director of the Company because of her inexperience in business matters and to have J. H. Shaw made president, and one J. M. Walker made executive vice-president and general manager with full power to do just about any legal act for the Company. The minutes show a meeting was held at the office of the Company. Although the minutes were signed by Mrs. Shaw and her son, and were signed by Walker after he was made an officer and director, none of the meetings were held and none of the motions were made as reflected by the minutes. In one of the minutes, Walker was given $10,000 worth of stock in the Company.

Soon after the death of Mr. Shaw the Company started operating by way of overdraft with the Bank and the overdraft at times ran as high as $45,000. In August of 1951, Stringer contacted Walker, manager of the Company, and informed him at that time that he was expecting the bank examiners and inquired if he thought it would be possible to get Mrs Shaw to cover their overdrafts while the bank examiners

were there. Subsequently, he called back and informed Walker that it would not be necessary to say anything to Mrs. Shaw at that time because the bank examiners had gone to the Peoples National Bank of Tyler instead of coming to his Bank, and to forget the subject. On the morning of September 7, 1951, Stringer called Walker and told him that he expected the bank examiners by 2:00 P.M. that day; that the Company was overdrawn by about $20,000 and asked if he thought he could get Mrs. Shaw to cover the overdraft. Stringer told Walker that Mrs. Shaw had a little over $9,000 on deposit with the Bank and that she had $10,000 in building and loan stock. Walker did not agree to try to get Mrs. Shaw to cover the overdrafts but did agree to go with Stringer to see her. Arrangements were made through her son Jimmy for Mr. Stringer and Mr. Walker to go to her home in Tyler and talk with her. Her son went ahead from the Company's place of business to her home and told her that Stringer and Walker were coming. They arrived about 11:00 A.M., and according to Mrs. Shaw's testimony, the following is a part of what happened:

"A. He said, 'Mrs. Shaw, I am in a terrible jam'; said, 'You know that I have been lenient; I wanted to see that packing house go over so much, knowing it was your husband's—dying husband's—last and one request to see it go over, and, naturally, I and the Bank have been interested in seeing it go over by being very lenient in the loans; and we have let them become overdrawn, and today we are overdrawn to the extent of $20,000.00; and I just came to see if you wouldn't cover me.' I said, 'Right there, Mr. Stringer, that is enough.' I said, 'If you have come to ask me to put a nickel in that packing house, my answer is no to you, sir.' I said, 'While I am not a business woman, I know that $19,000.00 which is my whole livelihood, and all that I have, would not survive a sinking packing house, and wouldn't even buy a truckload of cattle; so my answer there is no.' 'Oh,' he said, 'Wait a

minute, Mrs. Shaw, let me explain to you; I am in this jam. You see Mr. Pounds has just gotten word that the bank examiners are going to be in town, and you see what it will mean to me. It will mean maybe the pen or my job or maybe something worse, and the Bank, too; and we have all tried to go along with you. Don't you see, Mrs. Shaw, we have tried to be lenient with you; surely you would cover me for just such time as the bank examiners are here.' I said, 'I wouldn't know how long the bank examiners are going to be here; that is all I have. That is my insurance money and that is all Mr. Shaw left me.' He says, 'Well, they are here not less than seven days and not more than ten,' but he said, 'Surely, you wouldn't turn me down' and the tears trickled off his cheeks, looking straight at me, nice, honest-appearing eyes. I said, 'Oh, well, I wouldn't want to appear ungrateful for what you have done. I know you have tried to go along with us, and I do appreciate it,' and I said, 'I don't know what to do. *I wish you would give me a few days to think.' He says, 'No, I can't give you a few days because they will be here not later than seven in the morning, and I am in this awful jam; and if you could just let me have the money, I will assure you that you will get every penny of it back.' I said, 'You can assure me that I will get it back?' and he said, 'Oh, yes.' I said, 'And it is not going into the business?' He said, 'No, Ma'am, I haven't come for that. I have come to ask you to cover me for such time as they are here;'* said, 'It will be just as simple as this, Mrs. Shaw;' he took two papers out of his pocket, threw one over here, and says, 'They will say, "Stringer, how did you come to let this account get so overdrawn?" and I will say, "Here, this is covered; here is $9,000.00. Mrs. Shaw has covered it with her $9,000.00 deposit, and $10,000.00 building and loan."' I said, 'Well, that is only $19,-000.00, and that is all I have,' and says,

'What are you going to do for the other $1,000.00?' 'Oh, I will manage for that,' he says. I said, 'What are you going to leave me to live on? That is all I have.' He said, 'Don't you trust me, that I am on the level with you?' Mr. Walker spoke up and said, 'Harold, do you mean to say that you will see that Mrs. Shaw gets her money back if she covers you?' He said, 'I mean to say the day the bank examiners leave, I will continue the overdrafts with the Company and she can be paid her $19,000.00 back immediately.' I guess I meant then to help him; I felt sorry for him. I thought he was honest and I couldn't conceive of anybody with such honest eyes, nice, honest eyes, being anything but honest and, too, knowing that he was Executive Vice-President of the Bank, and Mr. Pounds had told him I felt, because he said, *'We, the Bank, don't you know that the Bank will be behind me;* that you will get it back, and it will be just as simple as this: Walker can write you out the $19,000.00 check the day after they leave, and you will go right on on that overdraft; pay back every dime of it.' I said, 'Well ——' ". (Emphasis ours.)

This testimony was corroborated by her son Jimmy and Mr. Walker, and was undenied by Stringer or the Bank. We point out and place emphasis on the fact that throughout the transaction the pleadings and supplications of Stringer were that she cover the overdraft for him and the Bank. Never at any time did anybody ask Mrs. Shaw to loan Shaw Packing Company one penny, not even her son Jimmy or Walker. There are two states of fact testified to by Mrs. Shaw as to the repayment of the money. One was that as soon as the bank examiners left town, Stringer was to repay her $9,000 and return her note and building and loan stock. The other was that as soon as the bank examiners left town, Shaw Packing Company would be permitted to go back on an overdraft basis and pay her that way. There was no pleading to support the last theory but it was tried by ex-

press consent of appellant and appellees and appellees labored the theory throughout the trial as a defense and which is the basis of their third assignment of grounds for motion for instructed verdict, because it was a promise of a future performance.

Mrs. Shaw gave her check for $9,000 payable to Shaw Packing Company and executed her note in the principal sum of $10,000 payable to the Bank, due in 30 days, and at the time, the overdraft at the Bank was actually only $12,390.85. On the same date, September 7, 1951, Mrs. Shaw's $19,000 plus an additional $10,900 was deposited to the account of the Company at the Bank. On the date, the deposits were made, Shaw Packing Company gave the Bank a. check payable to the Bank, for $19,000, signed by Walker. After the Company's account at the Bank was balanced showing an overdraft of $12,390.85, checks and drafts on the Company were received for payment by the Bank that day in the total sum of $532.18. The deposits, checks, and drafts were balanced against the overdraft of $12,390.85 and left a credit balance beginning on September 8, 1951, of $16,976.97. During the day of September 8, 1951, checks and drafts by the Company in the total sum of $998.11 were received for payment by the Bank and balanced against the account, leaving a net credit balance of $15,978.86. Then, the final balance that day shows the check payable to the Bank by the Company in the sum of $19,000 was cashed by the Bank and charged to the account of the Company, leaving an overdraft of $3,021.14. When the $19,000 was deposited, it was accounted for in the overdrafts and checks; then, when the check payable to the Bank was cashed and charged to that account the record clearly shows that the Bank got the $19,000. From there, the record is silent as to where the $19,000 went. Such is the state of the record.

At the conclusion of the evidence by appellant, she tendered a trial amendment wherein she alleged the agreement that Stringer and the Bank were to permit the Company to go back on overdraft and repay the money. The trial court refused to permit her to file her trial amendment, be-

cause, in the words of the court: "Overrule the motion on the ground it comes too late."

Appellees then filed their motion for an instructed verdict which was granted and judgment was entered that appellant take nothing by her suit and she has duly perfected her appeal. She brings forward two points of error.

### Opinion.

By Point 1 she complains of the action of the trial court in instructing a verdict against her, and in her statement and argument contends her pleadings and evidence were sufficient to require the submission of special issues to a jury.

■ We recognize the fact that "in order for a promise to constitute fraud it is necessary that it should have been made with the intent at the time that it would not be performed, and with the intention, design and purpose of deceiving. In other words, a promise made with a preconceived intention not to perform may amount to actionable fraud if the misrepresentation is material and is relied upon by the other party to his injury. This intention not to perform may be evidenced by circumstances. * * *" 20 Tex.Jur., Sec. 16, pp. 33, 34; 37 C.J.S., Fraud, § 12, p. 237; Manziel v. Williams, Tex.Civ.App., 262 S.W.2d 437, and authorities there cited. See also Henderson v. San Antonio & M. Railroad Co., 17 Tex. 560, and Cearly v. May, 106 Tex. 442, 167 S.W. 725.

■ We want to point out here that the evidence shows that on the very day, September 7, 1951, at which time the evidence shows the promises by Stringer on behalf of himself and the Bank that the overdrafts would be permitted to continue, that drafts in approximately the sum of $10,000 for cattle purchased by the Company at Ft. Worth were rejected and at a time when the Bank record shows Shaw Packing Company had a credit balance of $16,976.97. The evidence further shows other drafts were subsequently turned down and the Company was not permitted to repay Mrs. Shaw

by way of overdraft. We think the record in this case shows all the elements required by the law to be shown of present intent not to repay, and the court should have submitted the issues raised by the pleadings and the evidence with appropriate instructions and inquiry relative to the present intent of Stringer and the Bank at the time they got Mrs. Shaw's money.

Appellees take the position that there is no evidence to show that the Bank got the money, yet its own records prove to the contrary. The evidence shows that at the time all these matters were taking place, the Shaw Packing Company was indebted to Reconstruction Finance Corporation for about $100,000 to $110,000 and was indebted to appellee Bank in the sum of about $50,000 to $60,000. The evidence shows that shortly after Stringer and the Bank got Mrs. Shaw's money, Shaw Packing Company was liquidated, and as indicated by questions asked by attorneys for Stringer and the Bank, the Bank lost its indebtedness. If the overdraft had not been covered and had been permitted to continue, the Bank would have also lost the overdraft. Assuming that the Bank did not cash the check payable to it by the Company for $19,000, the evidence shows an overdraft of $12,390.85 at the time the money was acquired. And the Company had on deposit in the Bank approximately $7,000 at the time their assets were "frozen." Mrs. Shaw's $19,000 was accounted for in the overdraft and checks at the time they got her money and at the time the assets of the Company were frozen. In other words, the Bank would have suffered an additional $19,000 loss if it had not been for Mrs. Shaw's money.

The evidence also shows that on the date the money and note were obtained from Mrs. Shaw that Stringer went by the Company's place of business and picked up Walker and on the way from there to Mrs. Shaw's house, Stringer said something to Walker about Mrs. Shaw's getting $27,000 insurance when her husband died, and asked Walker if he knew whether Mrs. Shaw had any money in any other bank or anywhere else. Walker replied that he did not know.

Mrs. Shaw had about $200 to $250 left at the time she parted with her check and bonds. She became ill over the refusal of Stringer and the Bank to refund her money and was in the hospital for 28 days. She did not have enough money to pay her doctor bill and soon had to sell her home to have money to live on.

We hold that every element of fraud, as a matter of law and of fact, required by law to be pleaded and proved to entitle Mrs. Shaw to recover was pleaded and proved in this case. Therefore, the motion for instructed verdict should not have been granted. 41-B. Tex.Jur., 219 Sec. 188, and authorities there cited.

From what we have already said, the grounds assigned in Assignments I, II, III, IV and V of appellees' motion for instructed verdict are without merit; and further discussion under them is unnecessary.

■■ The sixth assignment of appellee Bank in its motion for instructed verdict is also without merit in this case. A principal who, with knowledge of the material facts, retains the benefits of a contract made in his behalf by an unauthorized agent cannot repudiate any part of the contract that is unsatisfactory to him. So, whether Stringer was shown to be the agent of the Bank or not (which we do not hold), the Bank having knowledge of the facts and retaining the benefits, it is considered as having ratified the contract in its entirety, and is so bound. Condor Petroleum Co. v. Greene, Tex.Civ.App., 164 S.W.2d 713, writ ref., w. o. m., and the numerous authorities therein cited.

■ One final word about future promises. As stated in Fowler v. Small, Tex. Civ.App., 244 S.W. 1096, 1098:

"* * * The doctrine of future promises has no applicability in this case. There is no decision which holds that when money is fraudulently obtained by means of a promise to perform a certain act, it cannot be recovered because it was obtained by a promise to perform a certain act after the

money was paid. Such a position would create a perfect travesty on justice."

Point one is sustained.

By Point two, appellant complains of the action of the trial court in refusing to permit her to file her trial amendment, contending that under Rules 66 and 67, T.R. C.P., she was entitled to do so.

■ We do not believe the reason given by the trial court for refusing appellant permission to file her trial amendment nor any other reason urged here by appellees is sufficient ground or grounds for refusal to permit the filing of such amendment. If the trial court granted the motion for instructed verdict on the ground of the third assignment in the motion for instructed verdict, he gave appellees the benefit of the issue raised by that evidence which was not pleaded as a defense. We think the issues raised by the evidence and sought to be pleaded, if available to appellees as a defense, constitute an affirmative defense that would have to be pleaded. Rule 94, V.A.T. R.C.P. Appellees failed to plead estoppel, failure of consideration, or avoidance based upon the promise to perform in the future.

■ We likewise think that if appellees had desired to rely upon such matters as an affirmative defense and had filed a trial amendment so alleging, at any time before the case was submitted to the jury, the trial court should have permitted them to file same, and submitted issues to the jury thereon.

■ If issues are tried by *implied consent,* the filing of trial amendments should be freely permitted, and special issues submitted. Rule 66, V.A.T.R.C.P., and authorities collated under Note 4; Rule 67, V.A.T.R.C.P., and authorities collated under Note 6. Where there is no specific pleading, but testimony is given without objection, the issue is triable under Rules of Civil Procedure on ground of implied consent. Daugherty Grain Co. v. S. T. Oates Grain Co., Tex.Civ.App., 191 S.W. 2d 804, no writ history.

■ It is an abuse of discretion for the trial court to refuse the filing of a trial amendment, even if the testimony sought to be offered is objected to, where the matters sought to be pleaded and proved are essential to the administration of justice, even though for either it necessitates a continuance. Robbins v. Jordan, 86 U.S.App.D.C. 304, 181 F.2d 793, and authorities cited therein.

■ The trial amendment did not come too late. An amendment may be allowed after verdict and before judgment. Milam v. Cooper, Tex.Civ.App., 258 S.W.2d 953, writ ref., n. r. e.; 2 McDonald Texas Civil Practice 738, Sec. 8.08.

As above pointed out, appellees failed to object to any of the testimony raising the issues, they thoroughly explored the same (apparently as a defense) and certainly would not have been in position to plead surprise and ask for a continuance. As a matter of fact, the record does not show that appellees objected to the filing of the trial amendment. We hold that the trial court abused his discretion in refusing appellant permission to file the trial amendment. Point 2 is sustained.

The judgment of the trial court is reversed and the cause is remanded.