SANTA ROSA MEDICAL CENTER,
Appellant,

v.

James H. ROBINSON, Appellee.

No. 15803.

Court of Civil Appeals of Texas,
San Antonio.

Dec. 21, 1977.

Paul M. Green, Lang, Cross, Ladon, Boldrick & Green, San Antonio, for appellant.

Phillip D. Hardberger, Donald J. Walheim, Hardberger, Branton & Herrera, San Antonio, for appellee.

KLINGEMAN, Justice.

Appellant, Santa Rosa Medical Center, appeals from a judgment against it in the amount of $445,000.00 for damages for personal injuries allegedly suffered by appellee, James H. Robinson. The parties will sometimes hereinafter be referred to as they were in the trial court, but in some instances plaintiff will be referred to as "Jimmy"; Santa Rosa Medical Center as "Santa Rosa"; and the Villa Rosa Annex as "Villa Rosa."

Trial was to a jury, who, in answer to special issues submitted, found:

1. The nursing staff of defendant was negligent in failing to contact a doctor prior to the time they did.

2. Such failure was a proximate cause of plaintiff's hemiparesis.

3. Plaintiff suffered damages because of such failure as follows:

(a) Past physical pain and mental anguish, $15,000.00;

(b) Future physical pain and mental anguish, $100,000.00;

(c) Past loss of earning capacity, $15,000.00;

(d) Future loss of earning capacity, $200,000.00;

(e) Past physical impairment, $15,000.00; and

(f) Future physical impairment, $100,000.00.

Plaintiff was a patient in the Villa Rosa Annex to the Santa Rosa Medical Center, undergoing psychiatric treatment. On November 18, 1972, at approximately 11:00 p.m., plaintiff was involved in a scuffle with a nursing assistant and sustained head injuries and an extradural hematoma developed, causing permanent brain damage. Plaintiff sued the hospital, for damages caused by the negligence of the hospital personnel in failing to timely notify a physician of the head injury, seeking damages in the amount of $350,000.00. A jury verdict in the amount of $445,000.00 resulted. The trial court, under objections, granted a post verdict trial amendment increasing the ad damnum clause to $445,000.00.

Defendant asserts 28 points of error, which can be broken down into the following categories:

1. Points of error complaining that the trial court erred in overruling defendant's (a) motion for directed verdict, (b) motion for judgment non obstante veredicto, and (c) entering judgment for plaintiff;

2. Points of error pertaining to causation;

3. Points of error pertaining to admissibility of evidence;

4. Points of error pertaining to trial amendments;

5. Points of error permitting to jury issues submission;

6. Points of error pertaining to damages.

The parties are in some dispute as to the standard of review in this case. Defendant asserts "no evidence," "insufficient evidence," and "against the great weight and preponderance" points of error, and asks that (a) this case be reversed and rendered; and (b) in the alternative, that it be reversed and remanded. The whole record must be examined not only to determine whether there is some evidence to support the jury's finding to the jury issues involved, but also to determine whether, considering all the evidence, the finding is not manifestly unjust. *See In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); O'Conner, *Appealing Jury Findings,* 12 Hous.L. Rev. 65 (1974).

The testimony is lengthy and extensive and we will not attempt to set it forth in full detail. Such testimony covers the full area of plaintiff's cause of action, including negligence, proximate cause, and damages.

## PROXIMATE CAUSE

It is to be remembered that the jury found that the nursing staff was negligent in failing to contact a doctor prior to the time that they did, and that such failure was a proximate cause of plaintiff's hemiparesis. The trier of the fact is usually allowed to decide the issue of causation in cases of this nature (1) when general experience and common sense will enable a layman to determine the causal relationship between the event and condition; (2) when scientific principles, usually provided by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) when probable causal relationship is shown by expert testimony. *Lenger v. Physician's General Hospital, Inc.,* 455 S.W.2d 703 (Tex.1970).

The testimony shows that Villa Rosa is an annex to Santa Rosa. It handles psychiatric cases, some of which are in connection with drug addiction problems.

The accident here involved happened at approximately 11:00 p. m. during the night shift (11 to 7). The testimony indicates that plaintiff and George Morales, a nursing assistant, were engaged in a scuffle, and there is some testimony that plaintiff was trying to kick Morales while Morales was stooping and that Morales grabbed plaintiff's ankle. In any event, plaintiff fell and struck his head. There is testimony by some witnesses that they heard a thumping noise. One witness stated that it sounded like a bowling ball dropping and hitting the floor, and another stated that it was like a baseball bat breaking when hitting a ball. There is testimony that plaintiff immediately complained that his head was hurting and that he vomited a number of times during the night. One nursing attendant testified that plaintiff was very lethargic—"real out of it." There is testimony that he moaned and groaned throughout the night; that his speech was "kind of" slurred; that he was not too responsive to verbal stimuli; and that he kept complaining of his head.

There is testimony as to varying blood pressures, but generally his blood pressure was not abnormal. There is also testimony by some witnesses that plaintiff talked coherently; that he walked around; and that on occasion he went to the bathroom. The sister in charge during this shift testified that she recalled nothing at all that was unusual or alarming about plaintiff's appearance. She did testify that she did not know that plaintiff had been vomiting and also that she thought that a doctor had been called.

A nursing care coordinator and supervisor testified that she came on duty at about 6:45 a. m.; that sometime thereafter she was told of the injury and after such report she went and looked at plaintiff; he seemed very sluggish and very lethargic; and that she made a number of tests or checks, including blood pressure, pulse, temperature, and pupils. She testified that there was nothing in the Nurses' Record to indicate that plaintiff's blood pressure or pulse rate had been taken between 11:20 p. m. and the

next morning at about the tour report change or around 7:00 a. m., but the fact that certain signs were not documented would not necessarily mean that they were not taken. She stated she called Dr. Mathis sometime after 7:30 a. m.; and that when she called she told the doctor of her various observations, the vital signs, and so on; that the doctor said he would be out as soon as he could get there; and that the doctor did come quickly. She further testified that the head injury incident should have been documented on the Nurses' Record, but it was not, and she stated that she would have called the doctor if she had been on duty that night. She testified that at 11:30 p. m. on November 18, Jimmy's blood pressure was reported at 170/110, and that this is high.

A registered nurse testified that the Nurses' Notes were incomplete in that all the vital signs should have been recorded after the accident and should have been taken every 15 minutes until Jimmy's condition stabilized; that the doctor should have been notified; and that complaint of a headache, the vomiting, and distorted memory are all classical symptoms of a head injury.

A professor of nursing at UTSA testified that she was embarrassed and shocked when she read the Nurses' Notes; that in a psychiatric hospital they should be very careful, and that accidents should be reported immediately; that someone in charge and a doctor should have been notified; that she would have been alarmed at the large drop in blood pressure from 11:20 to midnight; that in view of the entries that had been made throughout the night, it wasn't particularly surprising what happened at 8:20 a. m.; that from the first entry at 11:20 through the night, a knowledgeable nurse could see that Jimmy's condition was changing for the worse.

Dr. Edwin Mathis, a psychiatrist, testified that he had been giving Jimmy psychiatric treatment from about August 1972 until the accident. He testified that he was called by a Mrs. Stovall at approximately 8:20 a. m., who asked him if he was aware

that Jimmy Robinson had been comatosive or semi-comatosive for some hours and that he had been vomiting; that he told her to get an ambulance immediately and to have Jimmy transferred to Santa Rosa; that either he or the nurse called Dr. Lee, a neurosurgeon, and that within 40 minutes both he and Dr. Lee were at the hospital.

Dr. Mathis stated that he didn't even attempt to take x-rays; that the symptomology was so frightening that he wanted to have neurosurgeon present; that he was reasonably certain from the description that he obtained over the telephone that Jimmy had sustained a serious intercranial hemorrhage. He testified that if he had been called at midnight instead of 8:20 a. m. he would have definitely gone to the hospital; that he would have called Dr. Lee at that time; and that his actions would have been basically the same. He testified that he felt that the nurses should have called him long before they did; and that he should have been called at 11:20 p. m. and that he was at home at such time.

Dr. Fletcher Lee, a specialist in neurological surgery, the doctor who performed the operation on plaintiff, testified in some detail. He testified that the first contact he had with the plaintiff was on Sunday morning after the head injury; that he first carried out an arteriogram and subsequently an operation was performed to remove a blood clot that was present under the surface of plaintiff's brain. He discussed the blood pressure readings taken during the night and stated that such readings were not particularly alarming and stated that from a review of the Nurses' Notes, based upon such notes, he doubted that he would have ordered the transfer of the patient to the hospital at such time.

Dr. Lee testified that an arteriogram is a serious procedure in which a liquid dye is injected; that the arteriogram x-rays confirmed what he suspected, that there was an abnormal blood clot in Jimmy's head. He stated that, based on his examination of the Nurses' Notes, he doubted that the conditions were sufficient to justify an arteriogram at the times covered and that, based

on such notes, he doesn't think he would have transferred Jimmy from Villa Rosa to Santa Rosa during the night. He stated that the 8:00 a. m. notes indicated increased intercranial pressure and indicated that something needed to be done. He testified that the arteriogram was performed about 10:00 a. m. and the craniotomy was carried out around noon with the whole procedure ending about 1:40 p. m.

On cross examination he testified that when he saw Jimmy on Sunday morning he knew at that time that there had been, in medical probability, some irreversible damage, because Jimmy had developed a dilated and fixed pupil. He further testified that if good nursing procedure had been followed, the nurses would have called a doctor at 11:20 p. m.; that a difference in an operation performed at 10:00 or 11:00 in the morning and four or five hours earlier could have made an enormous difference in the eventual outcome of the patient, and in medical probability, the difference in time would have made a difference in this case.

Dr. Lee further testified of post-operative procedures and that a number of nerve blocks were performed on Jimmy in order to relieve some of Jimmy's spasticity; that other than nerve blocks and perhaps a very new drug on the market, there is very little that can be done about spasticity. He testified that Jimmy cannot carry out physical activities and that this would be expected to be a permanent situation.

Dr. Paul Rader, a specialist in neurosurgery, testified in considerable detail. His examination was based primarily on hospital records that were sent him, and he is of the opinion that a doctor can render a valid medical opinion from the readings of hospital records. He testified of extensive experience with regard to head injuries; that all head injuries are considered serious until proven otherwise. He stated that an extradural hematoma is one of the most acute emergencies in neurosurgery; and that hemiparesis is paralysis which is partial, not complete; and that Jimmy had evidence of this. He testified that blood clots are suspected in every head injury and that to determine whether a head injury is serious, there should be close observations of the patient's vital signs, levels of consciousness, x-rays of the head, etc. He stated that the records indicate that between 11:20 p. m. and 8:00 a. m. the next morning, the only vital sign taken was the blood pressure; and that assuming this is accurate and complete, this would have been below the minimal standard of nursing care and treatment; and that the vital signs should be recorded every 15 to 30 minutes after a head injury until the condition is stabilized.

When asked whether the nurse's delay in calling a doctor was the cause in fact of the hemiparesis he stated that he would say that it is, in a sense, that if you operate on people who have extradural hematoma early enough, they do not develop it, and a delay will increase the chances of this kind of residual paralysis.

When asked whether the failure of the nurses to call a doctor between 11:20 and 8:00 and the failure to have x-rays and diagnosis at an early stage could be a direct cause of the paralysis, he stated yes, that when you have arterial bleeding you have an increasing pressure on the brain and brain cells are going to die, with a resulting paralysis.

Dr. Rader was asked whether Jimmy's condition could have been avoided if a doctor had been called at 11:20 p. m. He stated that in reasonable medical probability, it could have, and that it could have either been avoided or minimized; that in reasonable medical probability, the patient's present neurological status has resulted substantially or in a substantial part, from this kind of delay. He stated that there was no doubt in medical probability that the patient's final outcome in this case was affected by the delay and that there is a connection between the failure to call a doctor and Jimmy's present condition of being partially paralyzed.

Our Supreme Court, in discussing proximate cause in *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex.1965), stated:

> But, as stated by this Court in *Porter v. Puryear,* supra [153 Tex. 82, 262 S.W.2d

933], '[t]he vital inquiry in any case involving proximate cause is whether the negligent act set in motion a natural and unbroken chain of events that led directly and proximately to a reasonably foreseeable injury or result.' (262 S.W.2d 933, 936).

In *Port Terminal Ry. Ass'n v. Ross,* 155 Tex. 447, 289 S.W.2d 220, 224 (1956), the Supreme Court stated:

Prosser states that if the defendant's act or omission was a substantial factor in bringing about the result, it will be regarded as a cause in fact, and that ordinarily it will be such a substantial factor if the result would not have occurred without it. Prosser, Law of Torts, p. 321, sec. 46. . . . It has also been pointed out repeatedly that for the defendant's negligence to be regarded as a proximate cause of the plaintiff's injury, it is not necessary that the exact nature of the injury or the precise manner of its infliction should reasonably have been foreseen. It is sufficient that the defendant should reasonably have anticipated consequences or an injury of the general nature of that which ensued.

*See* also *Bellaire General Hospital, Inc. v. Campbell,* 510 S.W.2d 94 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n. r. e.); *Levermann v. Cartall,* 393 S.W.2d 931 (Tex.Civ.App.—San Antonio 1965, writ ref'd n. r. e.).

■ There is clearly sufficient evidence to support the jury's finding that the nursing staff was negligent in failing to contact a doctor prior to the time they did. We have also concluded that the jury's answer to Special Issue No. 2 (proximate cause) is supported by legally and factually sufficient evidence. While there is conflicting testimony in some respects, there is sufficient evidence of probative value to support the jury answer to such special issues.

All of defendant's points of error pertaining to proximate cause are overruled.

## ADMISSIBILITY OF EVIDENCE

By two points of error defendant complains that the trial court erred: (1) in admitting plaintiff's exhibits numbers 1 and 2 (the head injury film and tape) into evidence because it constituted hearsay, was not relevant or material, was not based upon expert medical testimony, and the probable value, if any, was outweighed by its prejudicial effect; (2) in overruling defendant's objection to and timely motion to strike the testimony of the witness, Jurak, dealing with an unrelated incident which was not relevant or material to any issue in the case.

The film and tape involved are an in depth study of head injuries, including an instructional guide. They point out the nature of head injuries, the damage involved, the common symptoms, including nausea, vomiting, changes in pulse, respiration, blood pressure, headaches, vision problems, progressive deterioration of the patient's level of consciousness, etc. The film and tape were admitted by the trial court for the limited purpose of showing that it was used in the inservice training of the nursing staff at Villa Rosa.

There is testimony in the record that the film was owned by defendant, was used for personnel development of the hospital, and was noted in the official Villa Rosa nursing services procedural manual. Defendant's records indicate that the film was purchased in September 1971 by the personnel department and there is testimony that the film had been used since 1971 through the present time and still is being used.

Witness, Jurak, a nursing assistant, testified that he had seen the film on head injuries, and he further testified that when the in-service training film was shown it was required that it be observed by all of the nursing staff.

Defendant did not in any way attempt to impeach the contents of the film during the trial.

■ Under the record before us we do not regard the admission of such evidence for the limited purposes admitted as being error. In any event, it was harmless error. Entirely disregarding such evidence, there is other competent evidence that would suf-

ficiently support the jury's answers to Special Issues Nos. 1 and 2 (negligence and proximate cause).

■ *The Morales Incident.* Defendant also complains of the testimony of witness, Jurak, pertaining to defendant's policy to quickly attend the head injuries of its own nursing staff, and particularly to an incident involving nursing assistant George Morales. Such testimony indicated that Morales, after receiving a blow to the head, had received emergency treatment similar to that set forth in training films, including x-rays. Defendant contends that such incident was not relevant with regard to the standards of care to be applied to plaintiff. There was testimony in the record by Melvin Blumburg, a representative of defendant, who testified that the hospital policy for obtaining x-rays would be the same for a patient as it would be for a staff member. While such conduct is not controlling and should not be taken as the legal standard of care for negligence, it was evidence to be considered along with other circumstances in determining what the ordinarily reasonable man would do under the circumstances.

If there was any error in the admission of the film and the testimony as to the *Morales* incident, it was harmless error. *Gomez Leon v. State,* 426 S.W.2d 562 (Tex. 1968); *Aultman v. Dallas Railway & Terminal Co.,* 152 Tex. 509, 260 S.W.2d 596 (1953); *Swinney v. Winters,* 532 S.W.2d 396 (Tex. Civ.App.—San Antonio 1975, writ ref'd n. r. e.); *Reese v. Security Nat'l Ins. Co.,* 445 S.W.2d 811 (Tex.Civ.App.—San Antonio 1969, writ ref'd n. r. e.); *Crofford v. Bowden,* 311 S.W.2d 954 (Tex.Civ.App.—Fort Worth 1958, writ ref'd); Rules 434 and 503, Tex.R.Civ.P.

## TRIAL AMENDMENTS

By two points of error defendant complains that the trial court erred in (1) granting leave for the filing of plaintiff's second trial amendment alleging the existence of physical impairment as a separate element of damages at the conclusion of all the evidence, because such pleading added a new element of damages at a time when defendant was unable to refute the same; (2) granting plaintiff leave to file a post-verdict trial amendment because (a) it had the effect of increasing the total amount of damages claimed in plaintiff's previous trial pleadings and trial amendments; (b) it altered and modified the specific monetary amounts claimed for various elements of damages contained in plaintiff's trial pleadings and trial amendment; (c) it injected a monetary claim for the element of physical impairment for the first time after verdict.

There is a certain amount of overlapping in these points of error with the points of error to be herein discussed pertaining to damages. However, this particular portion of the opinion is restricted solely to the question of alleged error of the trial court in permitting the filing of the trial amendments here complained of.

The filing of a trial amendment is within the sound discretion of the trial court, and unless the trial court clearly abuses that discretion, no reversible error is shown. *Victory v. State,* 138 Tex. 285, 158 S.W.2d 760 (1942); *Hartford Accident & Indemnity Co. v. Thurmond,* 527 S.W.2d 180 (Tex.Civ. App.—Corpus Christi 1975, writ ref'd n. r. e.); Rule 46, Tex.R.Civ.P.; 46 Tex.Jur.2d *Pleadings* § 225 (1963).

Plaintiff's second trial amendment was offered at the conclusion of the evidence and alleges that plaintiff has suffered physical impairment in the past and will probably continue to suffer physical impairment in the future. As far as we can ascertain, defendant did not object to the filing of this amendment at the time it was offered; no motion for continuance was made, and no additional evidence was offered on either side after the court granted plaintiff leave to file such amendment.

■ Ordinarily, on appeal an objection to a pleading which is not made in the trial court comes too late, and a motion for continuance on the grounds of surprise is essential before the filing of a trial amendment will constitute reversible error. *See H. O. Dyer, Inc. v. Steele,* 489 S.W.2d 686 (Tex.Civ.App.—Houston [1st Dist.] 1972, no

writ); *Mergele v. Houston,* 436 S.W.2d 951 (Tex.Civ.App.—San Antonio 1968, writ ref'd n. r. e.); *Hardage v. Rouly,* 349 S.W.2d 616 (Tex.Civ.App.—Beaumont 1961, writ ref'd n. r. e.); *Dirks v. Dirks,* 302 S.W.2d 471 (Tex.Civ.App.—San Antonio 1957, writ dism'd); *Pacific Finance Loans v. Ingram,* 290 S.W.2d 261 (Tex.Civ.App.—Austin 1956, no writ); Rules 66 and 90, Tex.R.Civ.P.

■ We cannot say that the trial court abused its discretion in permitting the filing of this trial amendment in the absence of an objection, a plea of surprise, or a request for postponement or continuance.

The post verdict trial amendment was made to conform plaintiff's pleading to the jury's verdict on damages. Plaintiff's pleadings prior to verdict sought damages in the amount of $350,000.00. The jury awarding plaintiff a total of $445,000.00 ($15,000.00—past physical pain, $15,000.00—past loss of earning capacity, $200,000.00—future loss of earning capacity, $15,000.00—past physical impairment, $100,000.00—future physical impairment).

In *Irwin v. Whirley,* 538 S.W.2d 150 (Tex. Civ.App.—Waco 1976, no writ), plaintiff sued for specific performance of a contract of sale and real estate, seeking damages and also $5,000.00 for exemplary damages. The jury awarded several items of damages, plus $30,000.00 for exemplary damages. The trial court permitted plaintiff to file a post-verdict trial amendment praying for $30,000.00 exemplary damages. The appellate court affirmed, holding that there was no showing that the trial court abused its discretion in allowing the trial court amendment. However, the appellate court did find the judgment to be excessive to an extent and reduced the amount of the judgment.

■ There are a number of other cases supporting the position that a trial amendment may be allowed after verdict and before judgment. *See American Produce & Vegetable Co. v. J. D. Campisi's Italian Restaurant,* 533 S.W.2d 380 (Tex.Civ.App.—Tyler 1975, writ ref'd n. r. e.); *Tom's Toasted Peanuts, Inc. v. Doucette,* 469 S.W.2d

399 (Tex.Civ.App.—Beaumont 1971, writ ref'd n. r. e.); *Shaw v. Tyler Bank & Trust Co.,* 285 S.W.2d 782 (Tex.Civ.App.—Texarkana 1955, writ ref'd n. r. e.); *Milam v. Cooper Co.,* 258 S.W.2d 953 (Tex.Civ.App.—Waco 1953, writ ref'd n. r. e.).

In *Doucette,* Doucette sued for $31,000.00 for personal injuries and medical expenses and the jury awarded him $37,810.00. Doucette filed, over objections, a post verdict amendment increasing the ad damnum to an amount which was in excess of the jury's verdict. Appellant complained on appeal of the action of the trial court in permitting the filing of such post verdict trial amendment. The appellate court approved such filing, pointing out that the filing of a trial amendment is within the sound discretion of the trial court and that Rule 66 does not specify a time during a trial when amendment may not be allowed, and found no abuse of discretion by the trial court. The court did find the amount to be excessive and reduced the amount of the judgment.

■ Under the record before us, we have concluded that the trial court did not abuse its discretion in permitting the filing of (a) plaintiff's second trial amendment, and (b) plaintiff's post verdict trial amendment.

## DAMAGES AND JURY SUBMISSIONS

We will consider the balance of defendant's points of error and contentions together. They include numerous points of error complaining as to the manner and form of jury submission of the damage issue, points of error complaining of the factual and legal insufficiency of the evidence pertaining to the damages award, and points of error asserting that the jury's answer as to the damage issue and all component parts thereof are grossly excessive and seeking a reversal or remittitur on this basis.

Defendant asserts vigorously that the trial court's submission permitted, and the jury answers thereto reflect, an amount of overlapping, duplication, and double recovery.

The issues as submitted are not in accord with the form of submission suggested in

the Texas Pattern Jury Charges. 1 Texas Pattern Jury Charges §§ 11.03 and 11.04 (1969) list four elements of damages in this regard: past physical pain and mental anguish; future physical pain and mental anguish; past loss of earnings; and future loss of earnings. § 11.03 asks for the total amount of damages and lists the four elements above as to be considered. § 11.04 asks for the jury to consider these four elements separately. The jury charge here submitted contains these four elements and add two more: past physical impairment and future physical impairment. The jury herein awarded $215,000.00 total damages for past and future loss of earning capacity and $115,000.00 for past and future physical impairment. The jury also awarded $115,-000.00 for past and future physical pain and mental anguish.

Defendant asserts that such submission permitted overlapping, duplication, and double recovery. However, there are cases approving the type of submission herein used. The same six elements of damages were submitted and approved in *Green v. Baldree,* 497 S.W.2d 342 (Tex.Civ.App.— Houston [14th Dist.] 1973, no writ). The appellate court pointed out that it is somewhat difficult to direct the jury's attention to those different elements of damages, and at the same time be assured that the jury will not consider one of them twice; but stated that there was authority for the proposition that an allowance of recovery for physical impairment, as well as for lost earning capacity and pain, does not necessarily constitute an allowance of double recovery, citing a number of cases. See *Houston Transit Co. v. Felder,* 146 Tex. 428, 208 S.W.2d 880 (1948); *Charles T. Picton Lumber Co. v. Redden,* 452 S.W.2d 713 (Tex.Civ.App.—Corpus Christi 1970, writ ref'd n. r. e.); *Mikell v. La Beth,* 344 S.W.2d 702 (Tex.Civ.App.—Houston 1961, writ ref'd n. r. e.); *Riley v. Norman,* 275 S.W.2d 208 (Tex.Civ.App.—El Paso 1954, writ ref'd n. r. e.); *Southwestern Bell Telephone Co. v. Ferris,* 89 S.W.2d 229 (Tex.Civ.App.—Dallas 1935, writ dism'd).

The court then pointed out that it would not be proper in every personal injury case to instruct the jury that it might consider loss of earning capacity, pain, and physical impairment as separate elements of plaintiff's damages, and that in order to be entitled to that submission, the plaintiff must sustain the burden of proving that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial for which he should be compensated.

In *Riley v. Norman, supra,* the court stated that physical impairment and diminished capacity to work and earn money do not necessarily imply one and the same thing, and that in that case, both were proper elements of damages.

The testimony shows that plaintiff is suffering from hemiparesis, a form of partial paralysis; that he also suffers from spasticity; that he cannot carry out physical activities; that he is not capable of doing any of the usual and customary tasks of a working man; this is expected to be permanent; that he has difficulty focusing both eyes and sometimes becomes confused when reading; that he tends to slur words when talking; and that he is unable to perform activities requiring strength, endurance, and fine motor coordination.

There is testimony by a counselor and teacher at a special school that plaintiff attended that he is a well motivated student who makes good grades but has problems remembering; that Jimmy worried about dating and marriage and his future; and that she was worried about his future and that she had trouble figuring out what he could do. This counselor also testified that he appears to be suffering from pain at all times; and plaintiff himself testified that he has pain that hurts him at all times.

■ There is clearly a possibility of some overlapping and blending in the issues as submitted. However, we have concluded that under the record before us, the trial court did not commit reversible error in submitting the damages issue as here submitted.

We turn next to the award of $445,000.00, which is based upon the six elements hereinbefore discussed. The record here undoubtedly supports the award of a large sum of money as damages. The determination of the amount rests primarily with the jury, and there is no set formula applicable to cases of this character whereby the exact amount can be measured or ascertained. The amount of the award is not, however, free from control or revision by either the trial court or this court. As a general rule the verdict of the jury in this connection is subject to the supervision of the court, whether such verdict is too large or too small.

The applicable testimony pertaining to plaintiff's disability has been set forth in some detail. Plaintiff is a young man with a long life expectancy and is suffering from a great deal of disability. However, plaintiff's outlook while not optimistic, is not devoid of hope. Jimmy was 19 at the time of the accident, and there was no evidence of any previous work or earnings. This is understandable, but in the absence of such evidence, we feel it is competent to examine Jimmy's general history prior to the injury. It was not a good one. Such records indicate that he had a drug addiction problem and was undergoing psychiatric treatment at the time of the accident. There is testimony by his psychiatrist that he was having an up and down recovery and there is evidence that he had been "shot up" a week prior to the injury. There was no evidence that he had any type of job or that he was even going to school.

It appears to be a fair appraisal of his situation, from the record before us, that he was making only marginal progress toward becoming productive or useful, and there is nothing in the record to show that Jimmy, prior to his injury, had much propensity to do anything of a constructive nature. Since the accident, he has made a remarkable recovery from this problem. The evidence as hereinbefore pointed out indicates that he is severely handicapped, but there is evidence that he is now a good student, makes good grades, and is well motivated. There are indications that he can do some types of activities or work not involving strength or endurance.

It is also to be remembered that the pleadings, which plaintiff filed and maintained in the trial court until after the verdict, sought only $350,000.00 in damages.

■ After a careful consideration of the evidence, we have come to the conclusion that the verdict of the jury and the court's judgment is excessive by the sum of $95,000.00. The excessiveness of the award is simply that which in our best judgment exceeds the outside limits of propriety.

The judgment of the trial court, therefore, will be affirmed if the plaintiff will file in this court within 30 days hereof a remittitur in writing of $95,000.00; otherwise said judgment will be reversed and remanded for a new trial.

Affirmed on condition of remittitur.

CADENA, Chief Justice, dissenting.

I agree that the verdict in this case is excessive, but I cannot agree that the error is cured by ordering a remittitur in the sum of $95,000.00.

The majority opinion in this case does not state which of the six separate awards of damages is excessive, nor does it indicate the extent to which each award is excessive.

It can persuasively be argued that the award of $115,000.00 for past and future physical pain and mental anguish is not excessive, considering the nature of the injury and its after-effects. But I find no basis for the award of $15,000.00 for loss of earning capacity during the approximately three years intervening between the time of the injury and the trial, nor for the award of $200,000.00 as compensation for loss of earning capacity "which, in reasonable probability," plaintiff will sustain in the future.

There is no evidence to support a finding that, but for the injury, plaintiff would have, in reasonable probability, earned any amount whatever. There is no evidence that plaintiff had earned any income prior to the injury. This lack of evidence can

probably be explained by the fact that plaintiff was a heroin addict. As Justice Klingeman points out, plaintiff, prior to the injury, was making only "marginal progress toward becoming productive or useful," and he had been "shot up" a week prior to his injury. The majority opinion cannot go beyond the statement that plaintiff's outlook, prior to the injury, "was not devoid of hope." Simply stated, there is no evidence to support a finding that plaintiff's work history and "propensity to do anything" of a constructive nature would have been better in the future than it had been in the past. There is certainly no evidence that, but for the injury, he would have had the capacity to earn $15,000.00 during the three years preceding the trial and $200,000.00 during the remainder of his life expectancy. The excessiveness of the verdict concerning future impairment of earning capacity becomes patent when it is viewed in the light of the fact that the award of $200,000.00 represents merely the *present value* of the loss of earnings, and that plaintiff was not, prior to the injury, a normal young man of whom it could be said that he would become an ordinary productive member of society. Instead, he was a young man who, at best, was making only marginal progress toward overcoming his addiction. The possibility that a heroin addict will be rehabilitated is commonly known to be no more than slim.

The next awards which must be examined are those granting plaintiff recovery of $15,000.00 for past physical impairment and $100,000.00 for future physical impairment.

There can be no doubt that recovery of damages for physical impairment is proper, and that such recovery may properly be classified as an element of recoverable damage separate and apart from physical pain and loss of earning capacity. The example which comes most readily to mind is that of the young woman who, because of the injury, has become hideously scarred. The elements of recovery for physical impairment are sometimes grouped together under the classification "loss of enjoyment of life." Impairment of the capacity to enjoy life should be compensable. *Missouri Pacific*

*Ry. R. Co. v. Handley,* 341 S.W.2d 203 (Tex. Civ.App.—San Antonio 1960, no writ); *Galveston Electric Co. v. Biggs,* 14 S.W.2d 307 (Tex.Civ.App.—Galveston 1929, writ ref'd); Annot. 15 A.L.R.3d 506 (1967). *Cf. Locke v. International & G. N. R. Co.,* 25 Tex.Civ. App. 145, 60 S.W. 314 (Austin 1901, no writ). Inability to tie one's shoe laces, to take care of one's bodily needs, to hear beautiful music, to enjoy beautiful works of art, to play golf, etc. constitute a significant loss. But it seems clear that such impairment results in what the courts generally call "mental anguish."

In this case, mental anguish and physical impairment were separately listed as compensable items of damage. The majority opinion speaks of the "possibility" of double recovery in a case where the elements of mental anguish and physical impairment are submitted separately. This is an obvious understatement. Overlapping, resulting in double recovery, seems to be inevitable, and the situation is not remedied by a general caveat which, as here, merely cautions the jury that it "should not include the same element of damages more than one time."

In *Houston Transit Co. v. Felder,* 146 Tex. 428, 208 S.W.2d 880 (1948), the damage issue called for a lump sum award. The injury was instructed to consider past pain and suffering and mental anguish and disfigurement. Future pain and suffering and mental anguish were not submitted as recoverable elements of damages. The Supreme Court held that, under these circumstances, there was no significant prospect of a double recovery. In *Green v. Baldree,* 497 S.W.2d 342 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ), it was held that permitting recovery for physical impairment as well as for lost earning capacity does not necessarily allow double recovery.

Resort to past decisions is not significantly fruitful. In *International & G. N. Ry. Co. v. Butcher,* 98 Tex. 462, 84 S.W.2d 1052 (1905), a submission substantially in the form of that used by the trial court resulted in reversal because the manner of submis-

sion permitted a double recovery. A similar result was reached in *International-G. N. Ry. Co. v. King,* 41 S.W.2d 234 (Tex.Com. App.1931). In *Felder,* the Supreme Court distinguished *King* by saying merely that in the latter case the instruction "as a whole was confusing and misleading, and permitted the recovery of double damages," while describing the situation in *Felder* as being "clearly different from and [not running] counter to [King] and the authorities it cites and follows:" No attempt is made in *Felder* to explain why one charge is confusing and misleading, permitting double recovery, while another is not. Subsequent cases relying on *Felder* dispose of *King* in the same cavalier manner.

If, as I believe, the charge in this case does more than merely create a possibility of double recovery, this form of submission should be condemned. Where the element of physical impairment is present, difficulty can be avoided by submitting the element of mental anguish, accompanied by an instruction to the effect that in awarding compensation for mental anguish, the element of physical impairment may be considered.

I would leave undisturbed the award of $115,000.00 for past and future pain and mental anguish. The award for loss of past earnings I would reduce to $5,000.00, while reducing the award for impaired earning capacity in the future to $100,000.00. For past and future physical impairment I would award only $50,000.00.

These changes would reduce the amount of plaintiff's recovery to $270,000.00, requiring a remittitur of $175,000.00. I realize, of course, that in arriving at the amount of the required remittitur I have necessarily travelled a highway devoid of reliable guide signs, and that my conclusion is based on a feeling of what is right and just under the evidence in this case, making due allowance for the serious nature of plaintiff's injuries while, at the same time, attempting to compensate for the fact that the manner of submission of the damage issue makes it highly probable that a double recovery resulted.